# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **DONITA BARNES, individually** | ) | |
| **and as next of kin of** | ) | |
| **CYNTHIA KAY HORTON, deceased,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **vs.** | ) | **Case No. CIV-13-516-SPS** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Statement of the Case

On August 29, 2011, Cynthia Horton was admitted to the Chickasaw Nation Medical Center ("CNMC") for inpatient management of a resistant E. coli urinary tract infection following a failure of oral antibiotics begun on August 25, 2011. Ms. Horton was treated from August 29, 2011, through September 13, 2011 ("the first hospitalization), and Complete Blood Count ("CBC") laboratory tests were run on August 28, 29, 31, and September 4, 6, and 8. In each of these, Ms. Horton's white blood count ("WBC") results were elevated except for one on September 8, which was .1 below the upper limit of normal on the CNMC lab results. An elevated WBC count is a finding consistent with infection. No CBC test was ordered after September 8, 2011 but prior to her discharge on September 13, 2011.

On September 8, a CT scan of the abdomen revealed "evidence of air within the left hepatic lobe which likely represents portal venous air. Clinical correlation and aggressive

medical therapy recommended." The report further stated, "Please note that no acute process is seen at this time. However, the presence of portal venous air raises the possibility of bowel pathology, ischemic bowel and other significant processes and therefore surgical consultation is recommended." No surgical consultation was obtained.

Ms. Horton was re-admitted to CNMC on September 15, 2011, with complaints of severe diarrhea, abdominal pain, nausea, and vomiting, along with a fever, elevated heart rate, and elevated respiration. She informed caregivers upon re-admission to CNMC that these conditions began the same day as her discharge two days earlier, and she was treated with a presumptive diagnosis of Clostridium difficile colitis ("C. diff"). C. diff colitis is a foreseeable consequence of the intensive antibiotic therapy treatment Ms. Horton received. On September 15, 2011, a stool sample was collected and sent to an outside laboratory for testing to confirm Ms. Horton's presumptive C. diff diagnosis, although it took three full days before the results confirmed the C. diff diagnosis. On September 16, 2011, an abdominal CT scan revealed a marked diffuse thickening of the colon. Both Ms. Horton's treating physicians testified that she had other pre-existing medical conditions which would have made postop care at CNMC impossible and that there may have also been related time management issues, so CNMC surgeons would have chosen not to do surgery on Ms. Horton themselves.

During the second hospitalization, Ms. Horton's condition deteriorated and her WBC counts continued to rise from "high" to "critical value." Dr. Augustin Shi moved Ms. Horton to the intensive care unit at CNMC on September 18, but she continued to deteriorate until she was in multi-system organ failure on September 19. Ultimately, Ms.

Horton was transferred to Integris Baptist Hospital on September 19, 2011. When she arrived at Integris Baptist, Ms. Horton's condition required stabilization overnight before Dr. Hani Baradi operated on her the next day. Ms. Horton was unable to recover, and passed away on September 26, 2011.

Ms. Horton's daughter filed suit as next of kin on behalf of Ms. Horton, alleging medical negligence resulting in wrongful death, and this Court held a bench trial in this matter on May 11-13, 2015. Upon due consideration and review of the evidence, the Court makes its findings of facts and conclusions of law as stated below. Initially, the Court accepts the following stipulations submitted by the parties:

## Stipulations

1.      Cynthia Horton was a patient in the emergency room at CNMC in Ada, Oklahoma, on August 25, 2011, and August 28, 2011.

2.      Ms. Horton was admitted to CNMC as an inpatient from August 29, 2011 until September 13, 2011 ("first hospitalization").

3.      During this hospitalization Ms. Horton was under the care of physicians Dr. Augustin Shi, M.D.; Dr. Preston Hucks, M.D.; and Dr. Sally Berger, M.D.

4.      Dr. Shi, Dr. Hucks, and Dr. Berger were employees, agents, and servants of CNMC and covered at all times by the Federal Tort Claims Act ("FTCA").

5.      Ms. Horton was readmitted to CNMC on September 15, 2011, and remained there until her transfer to Integris Baptist Hospital on September 19, 2011 ("second hospitalization").

6.      During the second hospitalization, Ms. Horton was under the care of Dr. Shi and Dr. Hucks in their capacities as employees, agents, and servants of CNMC.

7.      Ms. Horton underwent surgery at Integris Baptist Hospital on September 20, 2011, which was performed by Dr. Hani Baradi.

8. Ms. Horton died on September 26, 2011. Her cause of death according to the State of Oklahoma Death Certificate was: Adult Respiratory Distress Syndrome Due to (or as a consequence of) Severe Clostridium Difficile Colitis.

9. The parties stipulate that all medical records identified by both parties are true and accurate. There are no hearsay objections to any of the records identified by either party.

10. This Court has jurisdiction of the case and all claims made.

11. The United States of America is liable for any and all damages to Plaintiffs proximately caused by the negligent acts or omissions of Dr. Shi, Dr. Hucks, Dr. Berger, or any of their agents and servants in the care and treatment of Ms. Horton.

12. All of Ms. Horton's medical bills from August 25, 2011 until the time of her death were paid by the Chickasaw Nation.

## Findings of Fact

### A. The Events

1. On August 25, 2011, Cynthia Horton was a 63-year-old female with a medical history including chronic obstructive pulmonary disease (COPD), polycythemia rubra vera[1], ulcers, superficial thrombophlebitis, thrombocytosis, gastro esophageal reflux disease (GERD), hypothyroidism, osteoarthritis, and hiatal hernia. Def. Ex. 1, p. 2.

2. Ms. Horton was also a smoker who reported smoking from half a pack to a pack and a half per day. Tr. Tra. p. 262; Def. Ex. 3.

3. During Ms. Horton's August 25 visit to the CNMC emergency room, cultures performed resulted in a diagnosis of a resistant E. coli urinary tract infection ("UTI"). Pl. Ex. 23, pp. 309-311.

First Hospitalization at CNMC (August 29, 2011 – September 13, 2011)

4. On Ms. Horton's August 28, 2011 visit to CNMC, cultures were again positive for a resistant E. coli urinary tract infection. Pl. Ex. 23, pp. 312-323.

5. Ms. Horton was admitted to CNMC on August 29, 2011, due to the results of the cultures performed the day before. Def. Exs. 3, 5.

---

[1] Polycythemia rubra vera is a blood disorder where there is an overproduction of cells from the bone marrow. For Ms. Horton, it required her to have a unit of blood removed on a periodic basis.

6.    At the time of her admission, Ms. Horton had a one-week history of fever, chills, myalgias, and urinary tract symptoms with dysuria, urgency, and frequency. Def. Ex. 3, p. 1.

7.    On August 29, 2011, Dr. Shi started Ms. Horton intravenously on a fourteen-day antibiotic treatment of cilastatin/imipenem to treat the resistant E. coli infection. Def. Ex. 3.

8.    C. diff is a known complication that can arise during the administration of IV antibiotics.

9.    Ms. Horton underwent Complete Blood Count (CBC) laboratory tests on August 25, 28, 29 and 31, and September 4, 6, and 8. Def. Ex. 7.

10.    For the CNMC lab, a normal range for a White Blood Cell (WBC) count was between 4,500 and 10,800 cells per cubic centimeter (represented as "4.50-10.8" on the lab results). Def. Ex. 7.

11.    An elevated, or abnormal, WBC is one indication of infection or inflammatory process. Tr. Tra. p. 54.

12.    Ms. Horton's WBC results during the first hospitalization were as follows:

      a.    August 25: 13.2.

      b.    August 28: 11.2.

      c.    August 29: 12.4.

      d.    August 31: 11.4.

      e.    September 4: 11.8.

      f.    September 6: 11.1.

      g.    September 8: 10.7. Pl. Ex. 7.

13.    No further CBC lab tests were performed after September 8 but prior to the September 13 discharge.

14.    Ms. Horton's temperature was checked approximately four times a day during this 14-day hospitalization. All were at or below 98.6, with the following exceptions. Pl. Ex. 23, pp. 2829-2834.

      a.    August 30: 98.7 at 06:54, 99.7 at 09:00, and 98.7 at 22:19. Pl. Ex. 23, p. 2833.

b.      August 31:  98.7 at 22:10.  Pl. Ex. 23, p. 2833.

c.      September 5:  99.8 at 22:05.  Pl. Ex. 23, p. 2832.

d.      September 6:  99.7 at 20:48.  Pl. Ex. 23, p. 2831.

e.      September 8:  98.8 at 09:46.  Pl. Ex. 23, p. 2831.

f.      September 11:  98.8 at 09:20, and 99.4 at 21:13.  Pl. Ex. 23, p. 2830.

g.      September 13:  two recorded temperatures, 98 and 100, both at 09:21. Pl. Ex. 23, p. 2829; Def. Ex. 1, pp. 951.

15.     On September 7, 2011, Dr. Berger ordered a CT scan to rule out either renal abscess or renal stones because they were having trouble clearing out her UTI.  Pl. Ex. 5, p. 4; Video Depo. Berger, p. 41.

16.     A CT scan of the abdomen and pelvis was performed on September 8, 2011. Pl. Ex. 4.

17.     The radiologist's impression was:  "There is evidence of air within the left hepatic lobe concerning for portal venous air.  Clinical correlation is suggested.  Please note that no acute bowel process is seen at this time.  However, the presence of portal venous air raises the possibility of bowel pathology, ischemic bowel and other significant processes and, therefore, surgical consultation is recommended.  The kidneys appear normal. Significant stool is seen within the right and transverse colon. Clinical correlation is suggested.  Splenomegaly.  Further clinical evaluation is recommended."  Pl. Ex. 4, p. 2.

18.     The radiologist, Dr. Ralph Noah, telephoned the preliminary interpretation to the urgent care department at the time of the study.  Pl. Ex. 4, p. 2.

19.     Plaintiff's expert, Dr. W. Owen Cramer, M.D., is a general surgeon in Houston, Texas.  Tr. Tra. p. 26.

20.     Dr. Cramer completed his undergraduate degree at Vanderbilt University, and went to the University of Texas Medical School in Houston, Texas.  Tr. Tra. p. 27.

21.     Dr. Cramer is board certified in general surgery by the American Board of Surgery, and is a member of the American College of Surgeons.  Tr.  Tra. p. 27.

22.     Dr. Cramer has thirty years of experience providing expert testimony, working for both plaintiffs and defendants in these matters.  Tr. Tra. p. 31.

23.     Specifically, Dr. Cramer has prior experience reviewing and testifying in cases involving allegations of medical negligence.  Tr. Tra. pp. 29-33.

24.     In this case, Dr. Cramer reviewed medical records from CNMC, Integris Baptist Hospital, and also reviewed depositions from Ms. Horton's two daughters, Dr. Baradi, Dr. Shi, Dr. Hucks, Dr. Berger, and Dr. Meese.  He reviewed radiology films relevant to this case.  Tr. Tra. pp. 35-37.

25.     Dr. Cramer holds the opinion that when a board certified radiologist raises the question of portal venous air, it is a deviation from accepted standards of medical care if a surgeon is not called and a consultation is not formalized.  Tr. Tra. pp. 27, line 25 – 28, line 5.

26.     Portal venous air can be a precursor or first sign in advance of an infected bowel.  Tr. Tra. p. 50, lines 7-10.

27.     Portal venous air is potentially fatal if unaddressed.  Tr. Tra. p. 226, lines 11-13; Pl. Ex. 4.

28.     If there is air in the portal vein, it is ominous because of the likely presence of ischemic bowel.  Tr. Tra. p. 46, lines 6-13.

29.     If the air is not in the portal vein, it could be in the biliary tree.  Air in the biliary tree is *not* life-threatening.  Tr. Tra. pp. 48, line 18 – p. 49, line 9.

30.     Dr. Hucks agreed that once the CT report included the possibility of portal venous air, it should have been part of the differential diagnosis.  Tr. Tra. p. 226, lines 7-23.

31.     A proper surgical consultation consists of a surgeon visiting a patient in response to a call from an attending physician, and conducting a physical examination, taking a history, and looking at ancillary studies including lab work and x-rays, in order to assess the patient.  Tr. Tra. pp. 226, line 21 – 228, line 11.

32.     Dr. Berger's last progress notes were made the last day she gave care to Ms. Horton, September 8, 2011.  Video Depo. Berger, pp. 12-13.

33.     Dr. Berger's treatment notes from September 8, 2011, acknowledge the CT scan and indicate that the plan was to "Re[check] labs" and "Discuss CT findings [with] surgery."  Pl. Ex. 5, p. 3; Video Depo. Berger, p. 18.

34.     Dr. Berger was not planning on rechecking the labs herself on the morning of September 8.  She would have ordered it herself if she planned on doing it that day.  Video Depo. Berger, p. 30, lines 14-19.

35.     Dr. Berger meant for someone else to recheck the labs going forward.  It was a suggestion to the other doctors, but she would have done it, and in her opinion, good practice would have dictated doing so.  Video Depo. Berger, pp. 32, line 12 – 33, line 2.

36.     Dr. Berger recalls calling to talk to a surgeon on September 8 towards the end of the day regarding Ms. Horton, but does not recall which of the two available surgeons she spoke to, and did not make any notes of that discussion.  Video Depo. Berger, pp. 36, line7 – 37, line 16, & p. 48, lines 9-16.

37.     Dr. Cramer provided the opinion that it is insufficient for the attending physician to merely speak with a surgeon.  Tr. Tra. p. 51, lines 8-11.

38.     Plaintiff's expert, Dr. Meese, testified that such "curbside" consultations are a common and acceptable practice.  Tr. Tra. p. 439, lines 12-16.

39.     Dr. Berger's memory of that conversation is that a surgeon told her that the CT scan results had nothing to do with what she was treating Ms. Horton for.  Video Depo. Berger, p. 41, lines 2-22.

40.     The record contains no indication that any of Ms. Horton's attending physicians spoke to a surgeon or that a surgeon actually provided a consultation for Ms. Horton.  Pl. Ex. 23.

41.     The Court finds that none of Ms. Horton's attending physicians (Dr. Berger, Dr. Shi, Dr. Hucks) contacted a surgeon at CNMC to obtain a *formal* surgical consultation.  Tr. Tra. pp. 173, line 6 – 175, line 8, & 226, line 21 – 228, line 15; Video Depo. Berger, pp. 59, line 15 – 60, line 15.

42.     As such, Ms. Horton was not provided a formal surgical consultation during the first hospitalization.  Tr. Tra. pp. 173, line 6 – p. 175, line 8, & 226, line 21 – 228, line 15; Video Depo. Berger, pp. 59, line 15 – 60, line 15.

43.     Dr. Hucks agrees that the failure to obtain a proper surgical consultation in this case would be a possible deviation from the standard of care and that to have practiced good medical care within the standard of care someone should have obtained a proper surgical consult.  Tr. Tra. pp. 228, lines 16-18, & 229, lines 14-17.

44.     On September 11, 2011, medical records indicate that Ms. Horton had a loose stool.  Pl. Ex. 23, pp. 180, 2830; Def. Ex. 1, p. 180; Tr. Tra. pp. 273.

45.     According to Dr. Cramer, the low-grade fever on September 11, 2011, in combination with the loose stool, should have been investigated with a C. diff analysis because these findings are exactly how C. diff starts.  Tr. Tra. pp. 59, line 16 – 60, line 13, & 61, lines 12-15.

46.     It is Dr. Cramer's opinion that Ms. Horton would have tested positive for C. diff during this first hospitalization, slightly before September 8 and possibly as early as September 6 or 7.  Tr. Tra. pp. 66, line 20 – 67, line 1.

47.     It is Dr. Cramer's opinion that, to a reasonable degree of medical probability, a C. diff test on September 11 would have been positive, and that the standard of care would have required the beginning of treatment for C. diff at that point.  Tr. Tra. p. 67, lines 7-21.

48.     Dr. Shi believes Ms. Horton was probably in the process of developing C. diff the last two or three days of her first hospitalization.  Tr. Tra. p. 189, lines 5-18.

49.     A lab urinalysis performed on September 12, 2011 contained trace proteins and indicated a high urine white blood cell count of 6-10, where the reference range was 0-2.  Def. Ex. 1, p. 276.

50.     Ms. Horton was discharged on September 13, 2011 from CNMC.  Def. Ex. 9.

51.     Dr. Hucks completed the discharge paperwork, and Dr. Shi assisted Dr. Hucks in discharging Ms. Horton from CNMC by reviewing her chart and speaking with Dr. Hucks.  Tr. Tra. pp. 180, line 24 – 181, line 15; Def. Ex. 9.

52.     Upon discharge, Dr. Hucks described Ms. Horton's condition as being afebrile for over a week, having a good appetite, doing well, and currently stable.  Def. Ex. 9, p. 1.

### Second Hospitalization at CNMC (September 15 – September 19, 2011)

53.     Ms. Horton returned to CNMC and was admitted in Dr. Shi's care on September 15, 2011, with complaints of nausea, diarrhea, vomiting, and abdominal pain ongoing for two days.  Pl. Ex. 10; Def. Ex. 1, p. 205; Tr. Tra. p. 186.

54.     Specifically, Ms. Horton reported the symptoms of diarrhea began on the evening of September 13, which was the day of her previous discharge from CNMC. Diarrhea is a hallmark sign that, based on the antibiotic therapy for treating her UTI, she had C. diff.  Tr. Tra. pp. 188-189; Pl. Ex. 10.

55.     At the time of her readmission, Ms. Horton had a temperature of 100, pulse of 123, and respirations of 18.  Pl. Ex. 10, p. 2.

56.     A CBC performed on September 15, 2011 revealed a WBC of 28.3, platelets of 727, and 13 bands,[2] all findings consistent with severe infection.  Pl. Ex. 8, p. 4.

---

[2] Bands indicate the progression of white cell count in a severe infection.  Tr. Tra. pp. 69, line 1 – 70, line 1.

57.     Dr. Shi ordered a test for C. diff on September 15, 2011, and a specimen was collected that day.  Pl. Ex. 23, p. 271.

58.     Ms. Horton tested positive for C. diff based on the September 15, 2011 specimen.  Pl. Ex. 23, p. 271.

59.     Results for the C. diff test were not received until September 18, 2011.  Pl. Ex. 23, p. 271.

60.     Although Ms. Horton's positive test result was not returned for three days, Dr. Shi and Dr. Hucks treated Ms. Horton with a presumptive C. diff diagnosis beginning September 15 upon her readmission for the second hospitalization.  Tr. Tra. pp. 63, 70-71, 238-239.

61.     Based on her symptoms, Dr. Shi believed Ms. Horton was probably highly likely suffering from C. diff.  Tr. Tra. pp. 186-187; Pl. Ex. 10.

62.     Upon admission and the presumptive C. diff diagnosis, Dr. Shi prescribed Ms. Horton oral Vancomycin and IV metronidazole.  Tr. Tra. p. 193.

63.     Defendant's expert Dr. Meese agrees that Ms. Horton pretty clearly had C. diff colitis based on her clinical symptoms of nausea, vomiting, diarrhea, and a distended abdomen, all of which were consistent with that diagnosis.  Tr. Tra. pp. 441-442.

64.     Dr. Cramer believes the antibiotics and IV fluids administered to Ms. Horton during her second hospitalization were appropriate choices for treating C. diff.  Tr. Tra. pp. 66, 70-71.

65.     Dr. Cramer believed that because Ms. Horton's symptoms had been ongoing for two days on September 15, the C. diff process was ongoing during her first hospitalization, to some degree.  Tr. Tra. pp. 63-64; Pl. Ex. 10.

66.     On September 16, Ms. Horton's temperature was 101.3 F at 09:27.  Pl. Ex. 23, p. 2829; Def. Ex. 1, p. 951.

67.     That same day, Dr. Hucks ordered a CT scan of Ms. Horton's abdomen and pelvis.  Pl. Ex. 12.

68.     The CT scan performed on September 16 revealed continued air collections in the left lobe of the liver.  When correlated with the prior study conducted on September 8, this was found to be "most consistent with pneumatobilia," . . . "Venous air is not excluded.  Marked diffused thickening of the wall of the colon with surrounding edema and inflammation with an appearance favoring colitis.  There is mild small bowel ileus without evidence of obstruction. Clinical correlation is recommended to exclude ischemia,

however, there is no evidence of bowel pneumatosis.[3]  Multiple ventral hernias containing both fat and bowel.  Small to moderate amount of free fluid in the pelvis."  Pl. Ex. 12; Def. Ex. 23, p. 297.

69.     The CT scan also described a decrease in curvilinear air, which Dr. Cramer believes was an indication that Ms. Horton's body was absorbing the air as opposed to an indicator that she was improving.  Tr. Tra. p. 83.

70.     Dr. Cramer believes that the CT scan showed an incredibly thickened colonic wall throughout the abdomen and that she needed an operation.  Tr. Tra. p. 42.

71.     Dr. Cramer believes the results of the CT scan were due to Ms. Horton's C. diff colitis infection.  Tr. Tra. p. 74.

72.     That same day, one of Ms. Horton's daughters found bloody stool on her mother's bed pad, and informed both doctors and nurses about the bloody stool and that it concerned her.  Tr. Tra. pp. 404-405.

73.     According to Dr. Cramer, whether the air in the left lobe was diagnosed as pneumatobilia or portal venous air, the severity and the seriousness of the thickened wall of the colon would not change.  Tr. Tra. pp. 83, line 12 – 85, line 11.

74.     Dr. Shi did not contact a surgeon at that time, and no surgeon or specialist of any sort at CNMC was ever contacted for a consultation (formal or informal) regarding the September 16, 2011 CT scan.  Tr. Tra. pp. 42, 207, 239.

75.     Dr. Cramer believes that the standard of care required a proper formal surgical consultation following the September 16 CT scan.  Tr. Tra. pp. 77, 80.

76.     Two surgeons worked at CNMC, and either of them *or* a locums tenen physician would have been available for a surgical consultation each day of Ms. Horton's hospitalizations at CNMC at issue in this case.  Tr. Tra. p. 208.

77.     Defendant's expert, Dr. Mark Russell Meese, M.D., is a general surgeon in Tulsa, Oklahoma and Owasso, Oklahoma, and has been in practice for twenty-five years. Tr. Tra. pp. 425-427.

78.     Dr. Meese attended undergraduate and medical school at the University of Oklahoma and completed his residency at the University of Oklahoma in Tulsa, Oklahoma. Tr. Tra. pp. 425-426.

---

[3] "Pneumatosis" is defined as "abnormal accumulation of gas in any tissue or part of the body." *Stedman's Medical Dictionary*, 28th ed. (2005).

79. Dr. Meese is board certified in general surgery. Tr. Tra. p. 426.

80. He testified that "You have to be able to put your hand on them and evaluate them and look at all their laboratory and physical – and vital sign findings all in the picture of her clinical status. And so if somebody is laying her hand on her and not feeling like her abdominal findings are getting any worse, then that's the key finding." Tr. Tra. p. 451, lines 8-14.

81. Here, the nursing record reflects that Ms. Horton continued to complain of abdominal pain, that her abdomen was soft and distended on September 16, but that it was hard and distended by September 17, and she had decreased bowel sounds by September 18, which caused the transfer to ICU. Pl. Ex. 23, pp. 230, 242, 244, 246, 262.

82. Neither of the two surgeons at CNMC was capable of handling the surgery for a patient such as Ms. Horton due to her underlying health problems and time management concerns. Tr. Tra. pp. 179-190, 248-249.

83. Neither Dr. Shi nor Dr. Hucks believes that Ms. Horton would have had surgery at CNMC if she needed it. Tr. Tra. pp. 178, 248-249.

84. Both Dr. Shi and Dr. Hucks agree that the surgeons at CNMC would not have operated on Ms. Horton while she was admitted there as a patient. Tr. Tra. pp. 178-190.

85. Dr. Shi believed that Ms. Horton needed a trial of antibiotics first to try to avoid surgery. Tr. Tra. p. 192.

86. On September 17, Ms. Horton's CBC test results revealed a WBC of 34.1 (noted on the lab sheet as an abnormal high/critical value), and bands of 24 (also noted as an abnormal high). Pl. Ex. 8, p. 3.

87. Dr. Shi read the CT scan report the morning of September 17. He does not recall talking to Dr. Hucks about the CT report. Tr. Tra. p. 204; Pl. Ex. 12.

88. Dr. Hucks was notified of this critical WBC count of 34.1 on September 17 at 06:21:55 a.m. There was no written reaction in the record, by Dr. Hucks or any healthcare provider, to the critical value WBC count. Pl. Ex. 8; Tr. Tra. p. 88.

89. Dr. Hucks testified that he informed Dr. Shi of these results during a morning meeting. He believes Dr. Shi then saw the patient. Tr. Tra. pp. 236-237.

90. Dr. Cramer believes these results are critical and needed to be dealt with by the attending physician, and that the elevated bands indicated an incredibly significant inflammatory process. Tr. Tra. pp. 87, 91.

91.     Dr. Shi does not believe a proper trial of antibiotics had occurred by this point on September 17.  Tr. Tra. p. 199.

92.     Dr. Shi knew about the lab results on September 17 when he saw Ms. Horton that day.  He does not recall discussing the lab results with Dr. Hucks.  Tr. Tra. p. 201.

93.     Dr. Shi's progress note from September 17 states that Ms. Horton was feeling a little better.  Pl. Ex. 6, p. 2.

94.     Dr. Hucks questioned Dr. Shi's assessment that she was feeling better.  Tr. Tra. p. 247.

95.     Ms. Horton's two daughters attempted to speak with Dr. Shi on the morning of September 17, 2011, to obtain an update and to know why their mother's WBC was still going up.  They were not able to talk to Dr. Shi on September 17.  Tr. Tra. pp. 348-349.

96.     On September 18, Ms. Horton's CBC test results revealed a WBC of 39.1 (noted on the lab sheet as an abnormal high/critical value), along with an abnormal high/critical value of 1107 platelet counts.[4]  Pl. Ex. 8, p. 2.

97.     On the morning of September 18, the lab notified Dr. Shi of the critical WBC count and elevated platelets, which were over one million and designated a high critical value.  In response to the notification of Dr. Shi, there were no new orders.  Tr. Tra. pp. 91-92, 210; Pl. Ex. 8, p. 2.

98.     Dr. Hucks believes that all of Ms. Horton's laboratory values between September 15 and September 19 were primarily attributable to the C. diff colitis infection, rather than her polycythemia rubra vera.  Tr. Tra. p. 252.

99.     A C. diff. patient who does not respond positively to antibiotics will ultimately become a surgical candidate.  Tr. Tra. p. 206, lines 20-24, p. 239, lines 10-11, & p. 461, lines 18-21.

100.    Dr. Cramer believes that more likely than not by the morning of September 17, if Ms. Horton's C. diff condition was going to respond appropriately to the antibiotics she was receiving, it would have shown itself by then.  Tr. Tra. p. 91.

101.    Dr. Cramer also believes that more likely than not by the morning of September 18, if Ms. Horton's C. diff condition was going to respond appropriately to the antibiotics she was receiving, it would have shown itself by then.  Tr. Tra. p. 91.

---

[4] The normal reference range at CNMC for platelets was 150-430.  Pl. Ex. 8, p.2.

102.    Dr. Shi agrees that on the morning of September 18, Ms. Horton had received two and a half days of antibiotics, which was a proper trial period. Tr. Tra. p. 209.

103.    Dr. Shi believes that if a positive response to the antibiotics was going to occur, it would have occurred by the morning of September 18. Tr. Tra. p. 209.

104.    Dr. Shi believes that, by the morning of September 18, 2011, Ms. Horton was probably failing her antibiotic treatment. Tr. Tra. pp. 210, 215-216.

105.    However, Dr. Hucks disagrees with Dr. Shi that the course of antibiotics had failed by the morning of September 18, 2011. Tr. Tra. p. 239.

106.    Dr. Hucks believes that you should allow three to four days for the antibiotics to work. If they fail to do so at that time, then you would get a surgical consultation. Tr. Tra. p. 239.

107.    Ms. Horton was not in multi-system organ failure on the morning of September 18, but she was having trouble with her kidneys. Tr. Tra. p. 94; Pl. Ex. 23, pp. 253-260; Def. Ex. 1, pp. 527-536.

108.    Dr. Cramer believes that, to a reasonable degree of medical probability, Ms. Horton would have survived surgery on September 16, 17, or 18, even in spite of her underlying medical condition and comorbidities. Tr. Tra. p. 100.

109.    On the morning of September 18, Dr. Shi spoke with Dr. Hucks. They talked about Ms. Horton's condition and decided to move her to the intensive care unit ("ICU") to give her one more day to try to turn her around before she had to have surgery, which she would have to obtain somewhere else. Tr. Tra. pp. 211-212.

110.    Ms. Horton's two daughters spoke with Dr. Hucks on Sunday, September 18, 2011, about having their mother transferred. He asked that they give him 24 more hours to move her to ICU to keep a closer watch. Tr. Tra. p. 350. This conversation is not part of his treatment notes. Pl. Ex. 6, p. 3.

111.    Dr. Hucks moved Ms. Horton to ICU at CNMC on September 18, 2011, in order to increase her fluids and properly monitor her fluids, but continued her medications. Tr. Tra. pp. 280, 284, 295-196; Pl. Ex. 23, p. 625.

112.    On September 18, 2011, Dr. Hucks believed that Ms. Horton was third spacing[5] because her bicarb was being lost due to her diarrhea and that moving her to the

---

[5] "Third spacing" is defined as fluid getting outside of the intravascular space and into the body cavity due to the fact that a patient is not getting enough fluids to replace the fluid lost through diarrhea. Tr. Tra. p. 285.

ICU would increase her IV fluids and better monitor her ins and outs.  Tr. Tra. pp. 282-284.

113.    On September 19, Ms. Horton's CBC test results revealed a WBC of 50.4 (noted on the lab sheets as an abnormal high/critical value).  Pl. Ex. 8, p. 1.

114.    Additionally, Ms. Horton's creatinine was 2.9, an abnormal high, and indicated a problem with her kidneys.  The normal reference range at CNMC was 0.6-1.3.  Pl. Ex. 6, p. 1; Pl. Ex. 23, p. 265.

115.    Dr. Shi testified that Ms. Horton had renal insufficiency but not renal failure the morning of September 19, because her kidneys had not shut down.  Tr. Tra. pp. 213-214; Pl. Ex. 6, p. 1.

116.    Dr. Shi's treatment notes from 08:08 a.m. on September 19 assess Ms. Horton as being in renal failure, and his plan included a note to check her labs "in AM."  Pl. Ex. 6, p. 1.

117.    Ms. Horton's daughters went to the hospital the morning of September 19 to check on their mother.  Upon making contact with Dr. Shi after 10:00 a.m., they told him they wanted their mother moved because she was in renal failure.  Tr. Tra. pp. 350-351; Def. Ex. 1, p. 524.

118.    Dr. Shi then made arrangements to transfer Ms. Horton to Integris Baptist Hospital, in the care of Dr. Robert Rankin.  Pl. Ex. 6, p. 1; Def. Ex. 1, pp. 524-525.

119.    Dr. Shi's discharge notes states that Ms. Horton's discharge diagnoses were: (1) pseudomembranous toxic enterocolitis secondary to Clostridium difficile, (2) polycythemia rubra vera, and (3) acute renal failure.  Pl. Ex. 13.

120.    He noted in his description of her hospital course that her BUN had gone from 11 to 39, and her creatinine had increased from 1 to 2.9 over the course of the second hospitalization.  Pl. Ex. 13.

121.    Dr. Hucks testified that Ms. Horton was in acute renal failure at the time of her discharge.  Tr. Tra. p. 299.

<u>Transfer to Integris Baptist Hospital (September 19, 2011 – September 26, 2011)</u>

122.    Dr. Shi ordered Ms. Horton transferred to Integris Baptist Hospital ("Integris") by ambulance on September 19, 2011.  Tr. Tra. p. 15; Def. Ex. 9; Pl. Ex. 14.

123.    Dr. Shi transferred Ms. Horton to the care of Dr. Robert Rankin.  Def. Ex. 1, pp. 524-525.

124. At the time of her transfer, she was in acute renal failure and her urine output was a source of concern and had been since September 18. Tr. Tra. p. 299; Pl. Ex. 14, p. 3; Pl. Ex. 23, p. 253; Def. Ex. 1, pp. 524-525.

125. Ms. Horton had a WBC of 50,000, creatinine was elevated at 2.7, and her international normalized ratio was elevated to 2.3. Pl. Ex. 14, p. 3; Pl. Ex 15, p. 3.

126. Additionally, Ms. Horton was septic and acidotic, her kidneys had failed, and she was in respiratory failure and intubated shortly after her admission at Integris. Pl. Ex. 14.

127. Upon Ms. Horton's arrival at Integris, Dr. Rankin ordered that she be seen by colorectal surgery, pulmonary, nephrology, and infectious disease. Pl. Ex. 14.

128. Dr. Hani Baradi, a colon and rectal surgeon, evaluated Ms. Horton soon after her arrival at Integris Hospital on September 19. Pl. Ex. 15.

129. During his physical exam of Ms. Horton, Dr. Baradi observed a distended abdomen. Video Depo. Baradi, pp. 28, line 2 – 29, line 2; Pl. Ex. 15.

130. At the time of Dr. Baradi's exam, Ms. Horton was in multi-system organ failure and she had a "very poor prognosis." Video Depo. Baradi, pp. 26, line 1 – 28, line 1; Pl. Ex. 15, p. 3.

131. In addition to his physical exam, Dr. Baradi utilized medical records sent from Chickasaw Nation along with his own history in making his treatment decisions. Video Depo. Baradi, p. 31, lines 2-16.

132. Dr. Baradi reviewed the September 16, 2011 CT scan sent from CNMC and used it as part of the basis for his treatment decisions. Video Depo. Baradi, p. 33, lines 16-25.

133. Dr. Baradi testified that he used the September 16 CT scan as an indication for surgical intervention for Ms. Horton. Video Depo. Baradi, pp. 39, line 13 – 41, line 1; Pl. Exs. 12, 51.

134. Dr. Baradi decided to perform surgery on September 20, 2011, the day after his evaluation. He did not operate on September 19 because Ms. Horton needed to be stabilized, her blood was too thin, and she had to be dialyzed because she was not making urine. Video Depo. Baradi, pp. 34, line 2 – 35, line 2; Pl. Ex. 15.

135. On September 20, 2011, Dr. Baradi performed a laparotomy and total colectomy procedure with end-ileostomy. During that surgery, he also performed an omentectomy, extensive lysis of adhesions and repair or an incarcerated recurrent incisional hernia with bilateral fascial releases. Pl. Ex. 16.

136. During surgery, Dr. Baradi found that the colon was inflamed, thickened, and swollen. He suspected ischemia[6] because the colon was dark and grey-ish in color, and that it was the result of her septic shock from C. diff. Video Depo. Baradi, pp. 50, line 25 – 51, line 6, & 53, line 18 – 54, line 5.

137. Dr. Baradi's operative findings were that Ms. Horton "had an incarcerated incisional hernia containing the transverse colon and omentum. She had ascites and Clostridium difficile colitis. The colon was ischemic." Pl. Ex. 16, p. 1.

138. At the conclusion of Dr. Baradi's surgery of Ms. Horton, her prognosis was still guarded because she was still in organ failure. Tr. Tra. pp. 54, line 20 – 55, line 7; Pl. Ex. 16.

139. The final surgical pathology reported a diagnosis of terminal ileum and colon (ileocolectomy) – diffuse/severe pseudomembranous colitis.[7] Pl. Ex. 24, pp. 191-192.

140. Dr. Baradi testified that when he looked at the bowel during her surgery, it looked dark and gray because Ms. Horton was in septic shock and circulation is usually diminished to the bowel. Video Depo. Baradi, pp. 72, line 25 – 73, line 20.

141. Dr. Meese agreed with Dr. Cramer and Dr. Baradi that the pathology report did not reflect that Ms. Horton had an ischemic bowel. Tr. Tra. p. 453, lines 1-17.

142. Ms. Horton's death summary from Integris Baptist stated that Ms. Horton initially appeared to have a "dead colon," but that final pathology revealed severe pseudomembranous colitis. Pl. Ex. 24, p. 147.

143. It was Dr. Cramer's opinion at the trial that the pathology report stating there was "focally thick extensive pseudomembranes subjacent to which are necrolytic crypts," was a statement that there was evidence of ischemia in the bowel, although he testified at his deposition that there was not a diagnosis of ischemia. Tr. Tra. pp. 157-158; Pl. Ex. 24, p. 191.

144. Ms. Horton died on September 26, 2011. Her cause of death was listed as acute respiratory distress syndrome with respiratory failure caused by C. diff induced colitis requiring surgery, and sepsis. Pl. Exs. 17, 20.

145. Ms. Horton's daughter Donita Barnes testified that she and her sister Helen were Ms. Horton's only biological children, that Ms. Horton was a wonderful mother, and

---

[6] Ischemia means gangrenous, and that there was not enough blood flow to the colon.

[7] The *Stedman's Medical Dictionary* definition of C. diff. states that it is a "frequent cause of colitis and diarrhea following antibiotic use. Found to be a cause of pseudomembranous colitis and associated with a number of intestinal diseases that are linked to antibiotic therapy." 28th ed. (2005).

that although Ms. Horton could be hard on Ms. Barnes, she was Ms. Barnes' best friend next to her sister. Tr. Tra. pp. 366, line 24 – 367, line 16.

146. Ms. Barnes testified that after her mother's death she became standoffish, still struggles with not being able to talk to her mother, and is very sad that her grandchildren will never know her mother. Tr. Tra. pp. 374, line 13 – 375, line 22.

147. Ms. Horton's daughter Helen McKay testified that her mother had been the glue to their family, organizing birthdays and holidays, and that losing her mother had changed her trust in medical staff and how she listens to doctors. Tr. Tra. p. 415, lines 5-21.

148. Ms. McKay testified that Ms. Horton had a close and loving relationship with her daughters, Ms. Horton's granddaughters, who frequently stayed with Ms. Horton. Tr. Tra. p. 413, lines 6-13; Pl. Exs. 27-45.

149. Ms. Horton also had a loving relationship with extended family. Pl. Exs. 27-45.

## Conclusions of Law

1. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1346, 1367, and 2671.

2. Under the Federal Tort Claims Act ("FTCA"), liability for medical malpractice is controlled by state law, in this case the state of Oklahoma. *Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990).

3. A plaintiff in a medical malpractice action must prove by a preponderance of the evidence that: (1) there was a duty owed by the Defendant to Plaintiff, (2) there was a failure to perform that duty, and (3) that injuries to the Plaintiff were proximately caused by the Defendant's failure(s). *Smith v. Hines*, 2011 OK 51, ¶ 12, 261 P.2d 1129, 1133.

4. CNMC is a facility that falls under the scope of the FTCA. 28 U.S.C. § 2671 et seq.

5. The standard of care in Oklahoma requires those engaging in the healing arts to be measured by the national standard. *Grayson v. State*, 1992 OK CIV APP 116, ¶ 13, 838 P.2d 546, 550.

6. "In treating a patient, a physician must use his or her best judgment and apply with ordinary care and diligence the knowledge and skills that is possessed and used by members of his or her profession in good standing engaged in the same field of practice at that time. . . . A physician does not guarantee a cure and is not responsible for the lack of success, unless that lack results from his or her failure to exercise ordinary care or from his

or her lack of that degree of knowledge and skill possessed by physicians in the same field of practice." Oklahoma Uniform Jury Instructions Civil 3d 14.1.

7. Dr. Shi, Dr. Hucks, and Dr. Berger were employees, agents, and servants of CNMC at all times relevant to their care of Ms. Horton, and covered at all times by the Federal Tort Claims Act.

8. Based on the medications prescribed to treat Ms. Horton's UTI, C. diff was a foreseeable consequence of that treatment.

9. The applicable standard of medical care required Dr. Shi and Dr. Hucks to perform further CBC studies between September 8, 2011 and September 13, 2011.

10. The Plaintiff bears the burden of producing evidence tending to establish a causal link between the alleged negligence and the injury, and Plaintiff also bears the burden of persuading the trier of fact by the greater weight of the evidence that her injury was in fact caused by the alleged negligence. *McKellips v. Saint Francis Hosp., Inc.*, 1987 OK 69, ¶ 10, 741 P.2d 467, 471. The "greater weight of the evidence" is construed to mean "more probably true than not true or more likely so than no so." "Absolute certainty is not required, however, mere possibility or speculation is insufficient." *Id.*, 1987 OK 69, ¶ 11, 741 P.2d at 471. If the probabilities are evenly balanced or less, the Plaintiff has failed to carry her burden. *Id.*

11. Proximate cause consists of cause in fact and legal causation. The latter concerns a determination as to whether legal liability should be imposed as a matter of law where cause in fact is established. Cause in fact deals with the "but for" consequences of an act. *McKellips*, 1987 OK 69, ¶ 9, 741 P.2d at 470.

12. The standard of medical care applicable to the physicians caring for Ms. Horton during her first hospitalization from August 29, 2011 through September 13, 2011, required them to obtain a proper surgical consultation as directed by the radiologist based on the September 8, 2011 CT scan.

13. Dr. Shi, Dr. Hucks, and Dr. Berger failed to meet the standard of care regarding surgical consultations with regard to the September 8, 2011 CT scan.

14. Dr. Shi properly assessed Ms. Horton with a presumptive C. diff diagnosis on September 15 and prescribed appropriate medications for the treatment of C. diff upon her re-admission on September 15.

15. Both Dr. Shi and Dr. Hucks properly treated Ms. Horton as having a presumptive C. diff diagnosis prior to the confirmation of her C. diff infection on September 18.

16.     Dr. Shi and Dr. Hucks deviated from the appropriate standard of medical care in failing to transfer Ms. Horton to a facility equipped to handle Ms. Horton's care.

17.     Dr. Shi and Dr. Hucks further deviated from the appropriate standard of medical care in failing to consult a surgeon based on the September 16 CT scan and her continued deterioration, including a progressively worse abdomen.

18.     It was foreseeable that a delay in surgery and/or transfer after September 18 would result in further deterioration, decreasing Ms. Horton's odds of survival.

19.     Dr. Shi and Dr. Hucks failed to meet the standard of care when they failed to transfer Ms. Horton until September 19, 2011, and only did so at the request of Ms. Horton's family members.

20.     The breach of the applicable standard of care at CNMC with regard to the failure to transfer Ms. Horton proximately caused injuries and ultimately the death of Ms. Horton, resulting in damages to Ms. Horton and to her daughters.

21.     The plaintiff Donita Barnes, individually and as next of kin of Cynthia K. Horton, deceased, has therefore established by a preponderance of the evidence the necessary elements required to prevail in a claim for injuries due to medical negligence resulting in wrongful death.

22.     The damages recoverable in actions for wrongful death are governed by Oklahoma state law, at 12 O.S. § 1053.

23.     Therefore, the Defendant United States of America is liable for the injuries and damages recoverable under 12 O.S. § 1053, as follows:

    a.     Burial and funeral expenses in the amount of $8,349.48, payable to Donita Barnes.

    b.     For Ms. Horton's mental pain and anguish, a total amount of $550,000.00, to be distributed equally to her children, Donita Barnes and Helen McKay.

    c.     For the grief and loss of companionship of Donita Barnes and Helen McKay, a total amount of $300,000.00, to be distributed equally to Donita Barnes and Helen McKay.

24.     Accordingly, the Court finds for the Plaintiff, Donita Barnes, individually and as next of kin of Cynthia K. Horton, deceased, in the amount of $858,349.48.

IT IS THEREFORE ORDERED that Judgment should be entered against Defendant United States of America and in favor of the Plaintiff, Donita Barnes, individually and as next kin of Cynthia K. Horton, deceased.

**IT IS SO ORDERED** this 30th day of March, 2016.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma